**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

E.S., a minor, by his parents and next friends,
B.S. & M.S.,

and

B.S. and M.S.,

      Plaintiffs,

      v.

JACK R. SMITH (officially as),  Superintendent,
Montgomery County Public Schools,
850 Hungerford Drive,
Rockville, Maryland 20850,

and

MONTGOMERY COUNTY BOARD OF
EDUCATION,
850 Hungerford Drive,
Rockville, Maryland 20850,

      Defendants.

Civil Action No. _____

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**Preliminary Statement**

1.      This is an action brought by B.S. and M.S. ("the parents"), in their own right and on behalf of their son, E.S., alleging that Montgomery County Public Schools ("MCPS" or "school system"), failed to provide E.S. with the Free Appropriate Public Education ("FAPE"), to which he is entitled under the Individuals With Disabilities Education Improvement Act ("IDEA"), 20 U.S.C. §§ 1400 *et seq.*  In addition, the Administrative Law Judge ("ALJ"), in this action compounded the violation when he determined that Individualized Education Program

-1-

("IEP"), and placement proposed by MCPS for E.S. for the 2016-17 school year was appropriate. The ALJ also improperly discredited and ignored the opinions of the parents' expert witnesses at hearing, instead choosing to rely upon the opinions of significantly less informed MCPS witnesses, and failed to reconcile contradictory record evidence in his decision. Accordingly, the ALJ denied the parents their requested relief of funding and placement at the Ivymount School ("Ivymount"). For any of these errors, the Court should reverse the ALJ's decision.

## Jurisdiction

2.      This Court has jurisdiction pursuant to the Individuals with Disabilities Education Improvement Act ("IDEA"), 20 U.S.C. §§ 1400 *et seq.*; the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794; 42 U.S.C. § 1983 ("Section 1983"); and 28 U.S.C. §§ 1331 and 1343. Declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202. This Court has pendent jurisdiction pursuant to MD. CODE ANN. EDUC. § 8-413. Plaintiffs have exhausted their administrative remedies and appeal from a decision of an Administrative Law Judge of the Maryland Office of Administrative Hearings, MSDE-MONT-OT-17-05289 (July 12, 2017).

## Parties

3.      E.S. is a thirteen-year-old educationally disabled student, eligible to receive special education and related services under the IDEA. At all times relevant to this action, he resided in Montgomery County, Maryland. His parents, B.S. and M.S., bring this action on E.S.'s behalf and in their own right.

4.      Jack R. Smith is the Superintendent of the Montgomery County Public Schools ("MCPS" or "the school system"), and as such, is the public official charged with the

responsibility for ensuring that MCPS complies with federal law as to the education of disabled children.  He is sued in his official capacity.

5.      The Montgomery County Board of Education receives financial assistance from the United States Department of Education.  The Montgomery County Board of Education is responsible for complying with federal law with respect to the provision of a FAPE to each disabled child in Montgomery County.

**Factual Allegations**

6.      E.S. is a thirteen-year-old student residing in Montgomery County, Maryland, who attends the Ivymount School ("Ivymount"), in Rockville, Maryland.

7.      E.S. has been found eligible for special education services as a student with Multiple Disabilities, including an Autism Spectrum Disorder ("ASD"), an Attention Deficit Hyperactivity Disorder ("ADHD"), and an Anxiety Disorder.

8.      MCPS has denied E.S. and his family a FAPE under the IDEA by failing to provide an appropriate IEP and placement for the 2016-17 school year.

9.      E.S. has a long history of emotional dysregulation, anxiety, and tantrums which became especially problematic around the time he began Kindergarten at Poolesville Elementary School ("Poolesville"), for the 2009-10 school year.

10.     While in the first grade at Poolesville in November 2011, E.S. was evaluated by Lisa Efron at Children's National Medical Center and diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD"), and Oppositional Defiant Disorder ("ODD").

11.    Dr. Efron's testing also revealed that E.S. had a number of intellectual gifts, including a Verbal Comprehension Index of 132 in the superior range, but also demonstrated areas of weakness in executive functioning, attention, and the ability to control his emotions.

12.    During first grade, E.S. began individual therapy and a variety of social skills groups, which were mostly ineffective in addressing his behavioral concerns.

13.    By the end of first grade, MCPS had provided E.S. with a Section 504 Plan to address his inattention, but did not address his academic and behavioral needs with special education services through an IEP.

14.    In September 2012, E.S. was diagnosed with a Generalized Anxiety Disorder, ADHD, and a Severe Mood Dysregulation Disorder by Dr. Kenneth Towbin at the National Institute of Mental Health ("NIMH").

15.    E.S. participated in an in-patient study at NIMH and during the course of the study, E.S. showed, "marked irritability, limited social understanding, desperate anxiety, and limited capacity for understanding his emotions or the context of his reactions."

16.    The NIMH evaluator suggested that E.S. may have an Autism Spectrum Disorder ("ASD"), and a Social Learning Disorder related to his pragmatic language impairments and rigidity in social situations.

17.    In 2012, E.S.'s parents hired an educational consultant, Rich Weinfeld, to assist the family in developing an educational program with the school system.

18.    While at Poolesville, E.S. was suspended on several occasions due to oppositional behavior, irritability, and anger.

19.     An MCPS IEP team determined that E.S. needed a more self-contained educational placement and transferred him to the Great Seneca Creek's Social and Emotional Support Services Program ("Great Seneca Creek"), for third grade, a program for students with Emotional Disabilities ("ED").

20.     E.S. stayed in the ED program at Great Seneca Creek through fifth grade.

21.     While at Great Seneca Creek, E.S. demonstrated mild to moderate social deficits and experienced social isolation by his peers.  Academically, he had difficulty with organization of ideas for writing, but excelled in reading and math.

22.     In 2015, E.S.'s fifth grade teacher at Great Seneca Creek completed an educational assessment report and concluded that he needed a variety of supports in the classroom, including strategies to strengthen problem-solving skills to address behaviors that impact his academic and social-emotional progress.

23.     At an IEP meeting at the end of E.S.'s fifth grade year to discuss E.S.'s progress, the team considered transferring E.S. out of the ED program.  His parents requested a small instructional setting with a small staff-to-student ratio.

24.     MCPS placed E.S. in the Asperger program at Ridgeview Middle School ("Ridgeview"), for sixth grade.

25.     In September 2015, E.S. began at Ridgeview, but still had frequent behavioral episodes and hyperactivity issues.

26.     E.S.'s parents were unaware of Ridgeview's inability to program for him until they attended an IEP meeting on March 3, 2016.

27.    During the March 3, 2016 IEP meeting, an MCPS psychologist made an observation asking the team to consider whether Ridgeview could continue to support E.S.'s needs.  When the parents asked the psychologist to clarify, she declined to answer and stated that no recommendation could be made until the IEP had been reviewed.

28.    At the end of the March 3, 2016 IEP meeting, MCPS staff informed the parents that they could no longer manage E.S.'s behavioral and learning challenges at Ridgeview and recommended that he attend the Bridge program at Gaithersburg Middle School ("Bridge"), after the upcoming spring break.

29.    The parents stated their disagreement with the proposed mid-year move to Bridge, mostly because they were unaware that Ridgeview was even considering a transfer, and had thought E.S. was improving, both at home and at school, after having received mostly positive communication from Ridgeview staff.

30.    Feeling "ambushed" by the MCPS team, the parents voiced their discontent to the MCPS Director of Special Education, Phil Lynch, in a letter on March 9, 2016.  The parents expressed their concern for the apparent predetermination of E.S.'s transfer to the Bridge program without meaningful discussion, prior notice, or their input and stated that they did not object to considering the Bridge program, but would first like to observe it before making a decision.

31.    The parents re-enlisted the help of Mr. Weinfeld and asked that he observe E.S. in his classroom at Ridgeview in the spring of 2016.

32.    On April 13, 2016, Mr. Weinfeld observed E.S.'s math and World Studies classes at Ridgeview.

33.    In the math class observed by Mr. Weinfeld, E.S. had a paraeducator working with him and seemed to respond well to the support.  The teacher explained that the paraeducator was new to the classroom and that she was providing "a lot" of intervention to E.S.

34.    In the World Studies class observed by Mr. Weinfeld, the teacher reported that E.S. always does well in his class.

35.    Mr. Weinfeld spoke with other staff members at Ridgeview, including the program specialists from the Autism and Asperger units.  They reported that E.S. does better in self-contained smaller classes, but they were not pushing him as much due to several explosive incidents earlier in the year.

36.    The Ridgeview staff shared with Mr. Weinfeld that they could not meet E.S.'s mental health needs and recommended that he attend the Bridge program because it had worked well for other students.

37.    Ridgeview staff also informed Mr. Weinfeld that E.S. had already been placed in the Bridge program for the following school year.

38.    At the conclusion of his observation at Ridgeview, Mr. Weinfeld concluded that E.S. needed a program designed for students capable of challenging academic work while providing supports for dealing with frustration.

39.    On May 2, 2016, Mr. Weinfeld met with Katherine Schwartz to observe the Bridge program.

40.    Ms. Schwartz explained that the Bridge program is located in the same building as the Autism Resource Services ("ARS"), and Learning and Academic Disabilities ("LAD"), services.

-7-

41.    Ms. Schwartz told Mr. Weinfeld that many students in the Bridge program attended general education classes with flexible support and that the students could request time with a psychologist or social worker, but those professionals are shared with Gaithersburg High School.

42.    Ms. Schwartz also shared with Mr. Weinfeld that there had been an increase in the number of students battling depression and the Bridge program was not appropriate for kids who are aggressive or acting out because the students battling depression were easy targets for bullying.

43.    Mr. Weinfeld concluded from his visit that the Bridge program would not be appropriate for E.S. due to his social learning problem and tendency to turn aggressive when frustrated.

44.    E.S. completed the remainder of the 2015-16 school year at Ridgeview.

45.    On June 2, 2016, Dr. Lance Clawson completed a psychiatric evaluation of E.S. to assist the parents in their school placement decision.

46.    Dr. Clawson observed E.S. in his office and noted that, "as the session continued, he became more and aroused and impulsive with more physical and aggressive play until limits had to be set on him."

47.    Dr. Clawson concluded that E.S.'s intelligence and self-awareness added to his burden because he was able to realize behavioral shortcomings without any affective control to match his insights.

48.    Dr. Clawson reported, "I am concerned about his current school placement, in that the apparent lack of a comprehensive BIP [Behavior Intervention Plan] and the wish to return

-8-

him to an ED program, which doesn't have the direct social instruction and behavioral management necessary for his management."

49.     Dr. Clawson concluded that E.S. required a school placement that had intensive social training and extensive behavioral expertise to address his ASD.

50.     Dr. Clawson further recommended that Ivymount be considered for E.S. because it provides both behavioral expertise and intensive social training, as well as cognitive therapy approaches that E.S. needs to address social weaknesses.

51.     On June 14, 2016, E.S. was suspended from Ridgeview for four days following a behavioral incident which involved physical aggression toward another student, and his failure to listen to or follow adult directions.

52.     The June 14, 2016 event was not corroborated by another adult, and involved both E.S. and another student becoming physical in a hallway without an adult present.

53.     The parents picked E.S. up from school after the June 14, 2016 incident and were told later that evening by the assistant principal that with the school year ending in four days, E.S. would be suspended for the remainder of the school year.

54.     The parents received a letter informing them of E.S.'s suspension ten days after the June 14, 2016 incident, after the deadline to appeal the decision.  The letter was postmarked nine days after the date on the letter.

55.     An IEP periodic review meeting was next held at Ridgeview on July 18, 2016. The team updated E.S.'s BIP with data supporting the need for small classes, a team to support him in critical incidents, and access to staff with expertise in supporting social-emotional problem solving.

56.     The parents and Mr. Weinfeld expressed their belief that the IEP goals were set too low, but they were not changed.

57.     The MCPS team proposed twenty-nine hours and twenty minutes of specialized instruction outside the general education setting, with the option to "self-select" lunch in the general education setting in the July 18, 2016 IEP.  The team continued to propose Bridge.

58.     The Bridge representative, Ms. Schwartz, initially stated that Bridge could not implement E.S.'s IEP, but later changed her position and said they would "try," but E.S. would be in general education for part of the day, including lunch and the physical education locker room.

59.     Bridge staff confirmed they could not provide a therapeutic setting.

60.     MCPS staff maintained that E.S. did not need a therapeutic setting during the July 18, 2016 IEP meeting.

61.     The parents did not agree with the school system's July 2016 IEP proposal and continued to express their belief that E.S. required a full-time therapeutic placement that could address his needs as a high-functioning student with Autism.

62.     Based on Dr. Clawson's and Mr. Weinfeld's opinions, the parents applied to the Ivymount School and E.S. was accepted on August 5, 2016.

63.     On August 10, 2016, the parents served notice of their intent to place E.S. at Ivymount for the 2016-17 school year and requested that MCPS fund his placement there.

64.     On August 25, 2016, MCPS responded, declining to place E.S. at Ivymount because of the belief that a FAPE had been offered for the 2016-17 school year.

65.     On August 24, 2016, E.S. began the Model Asperger's Program ("MAP"), at Ivymount.

66.     The MAP program provides E.S. with several accommodations throughout the day including a small staff/student ration (1:1-4), ongoing social feedback, technological support, integrated therapy, and instruction differentiated for learning strengths and needs.  The teachers and related services staffs work together to create a fully-integrated curriculum and ensure that both skill sets (academic and social) are reinforced continually throughout the day.

67.     One week after starting Ivymount, E.S.'s parents reported that he seemed "happy" and that the morning routine, which had always been difficult, had been relatively easy.  When they asked him what the difference was, he replied that the lack of a lunchroom and crowded hallways made him less anxious about school, and that a number of staff helped him to feel much more at ease.

68.     On October 4, 2016, Mr. Weinfeld observed E.S. in his math and "team building" classes at Ivymount, noting that he seemed interested in social interactions, was motivated to demonstrate success, was on-task most of the time and frequently volunteered in class.

69.     Mr. Weinfeld found E.S. to be significantly aggressive and impulsive at times, and inappropriately silly at other times.  He was also periodically disruptive and had limited social interactions.

70.     Mr. Weinfeld spoke with Ivymount staff who stated that E.S. had more social skills than most students; however, he had had two "high magnitude" events where he became very aggressive and tried to elope.  Staff described those behaviors as concerning and requiring

more structure and high expectations, but the staff remained confident that E.S. would be able to attend a less restrictive environment eventually.

71.    After gathering and analyzing its data, Ivymount held a meeting on December 1, 2016 to develop E.S.'s IEP.  The team discussed his current levels of performance in math, reading, written language, social/emotional and executive functioning.  Goals were developed for written language, behavior management, and social/emotional skills.

72.    In addition to the goals and objectives, the final Ivymount IEP document provided sixty minutes of counseling per week.

73.    On December 5, 2016, E.S.'s homeroom teacher, Lynn Southern, completed an annual educational report on his progress since beginning at Ivymount.

74.    Ms. Southern reported that E.S. was on grade level in math, above grade level in reading, but still struggling to slow down and produce appropriate written work.

75.    Ms. Southern reported that E.S. had significant difficulty understanding classroom rules/expectations when he first arrived at Ivymount, but had since been receptive to the classroom behavior management system.

76.    Ms. Southern explained that E.S. required significant teacher support (three or more prompts) to access strategies and self-regulate when annoyed or frustrated.

77.    Ms. Southern described that E.S.'s biggest challenge when making friends was difficulty regulating emotions and his failure to interpret social cues, and that when he misunderstands social cues, he becomes extremely rigid and inflexible.

78.    Ms. Southern concluded that E.S. will continue to work on identifying "hot spots" throughout his day and calming strategies.  She also noted that E.S.'s ability to accept feedback had improved significantly, but they would be continuing to work on this with him.

79.    E.S.'s parents observed the Bridge program at Gaithersburg Middle on January 17, 2017 and met with Katherine Schwartz.

80.    Ms. Schwartz provided the parents with information regarding class sizes and student profiles at Bridge, and also informed the parents that electives were not offered in self-contained classes.

81.    Based on the information obtained from their visit to Bridge, the parents remained certain that Bridge was not an appropriate placement because it could not implement E.S.'s IEP as written, which called for self-contained electives.

82.    On February 21, 2017, the parents filed a due process hearing request challenging the appropriateness of the school system's proposal for E.S. to attend Bridge, and seeking reimbursement for his placement at Ivymount.

83.    On March 7, 2017, the parents filed an unopposed motion to amend their due process hearing request to include a more accurate, "description of the proposed solution."  The parents' motion was granted on March 10, 2017.

84.    A due process hearing was held on May 22, 24, 25, 30, 31, and June 17, 2017.

85.    The parents presented testimony from four witnesses, Rich Weinfeld, the family's educational consultant and an expert in special education with an emphasis on the education of high-functioning Autistic children and twice-exceptional students; Jennifer Engel, program coordinator for the Model Asperger's Program and an expert in special education with an

emphasis on the supervision of educational programming of children with Autism; and E.S.'s

parents, B.S. and M.S.

86.    MCPS presented testimony from four witnesses, Mallory Potter, special education

teacher at Ridgeview and an expert in special education; Robin Daisey, MCPS Autism Program

Specialist and an expert in special education with specialization in the education of students with

Autism; April Schwarz, school psychologist for MCPS Autism and Asperger's programs and an

expert in psychology with an emphasis on students with Autism; and Katherine Schwartz,

resource teacher at Bridge and an expert in special education, with an emphasis on students with

behavioral problems.

87.    The parents' witnesses all testified to E.S.'s significant educational needs which

impact him throughout the entire school day.

88.    The parents' witnesses all testified to the significant benefit that E.S. is receiving

at Ivymount.

89.    The parents' witnesses expressed specific, detailed concerns regarding the

appropriateness of the proposed MCPS program for him.

90.    On July 12, 2017, the ALJ issued his Decision.

91.    The ALJ concluded that the MCPS July 18, 2016 IEP provided a FAPE to E.S. for

the 2016-17 school year.

92.    The ALJ erroneously dismissed the opinions of the parents' expert witnesses.

93.    The ALJ incorrectly gave little weight to the testimony of Mr. Weinfeld, writing

that his opinion was based upon minor criticisms of the July 18, 2016 IEP and the placement

-14-

decision at Bridge, and that he only provided generalizations for why he believed Bridge was inappropriate for E.S.

94.    The ALJ improperly concluded that Mr. Weinfeld's opinion was based upon, in large part, obtaining the parents' goal of placement for E.S. at Ivymount and convincing the ALJ that the proposed program at Bridge was inappropriate for him.

95.    The ALJ erroneously failed to consider the testimony of Ms. Engel because she testified about Ivymount and did not criticize the MCPS IEP.

96.    The ALJ improperly credited the testimony of the MCPS witnesses over the testimony and opinions of the parents' experts.

97.    The ALJ repeatedly overstated the MCPS witnesses' knowledge of and experience with E.S. and the proposed MCPS programs.

98.    The ALJ incorrectly concluded that the proposed MCPS IEP was reasonably calculated to meet E.S.'s needs.

99.    The ALJ erroneously concluded that the proposed MCPS IEP was tailored to meet E.S.'s unique needs.

100.    The ALJ incorrectly concluded that the opinions of the MCPS educators were entitled to deference and that MCPS provided a cogent and responsive explanation for its IEP proposal.

101.    The ALJ improperly concluded that the proposed MCPS IEP is the least restrictive environment for E.S.

102.    The ALJ improperly dismissed the parents' arguments regarding predetermination, erroneously concluding that the MCPS IEP team members did not predetermine E.S.'s placement.

103.    The ALJ denied the parents all relief.

104.    The ALJ's Decision contains multiple errors of fact and law.

105.    The ALJ's findings of fact are not regularly made.

106.    The ALJ consistently omitted relevant evidence from the record in his findings of fact to fit the narrative of E.S. he chose to write in his Decision.

107.    The ALJ improperly rejected evidence at hearing outside of the two-year statute of limitations as irrelevant to his decision or stated that he would afford exhibits outside of the two-year timeline little weight due to their age, despite devoting twenty percent of his findings of fact to this time period.

108.    The ALJ's Findings of Fact evidence a clear pattern of excluding significant facts contrary to the MCPS position, or often simply misstating such facts.

109.    The ALJ's Findings of Fact do not even acknowledge or include the dispositive fact that E.S.'s MCPS Case Manager, Ms. Potter, acknowledged under oath that MCPS predetermined that E.S. would attend Bridge before convening the July 18, 2016 IEP meeting.

110.    Finding of Fact 15 of the ALJ's Decision inaccurately describes the results of E.S.'s private psychological evaluation.

111.    Finding of Fact 21 of the ALJ's Decision overlooks key evidence in the record, ignoring the portions of the NIMH Children's School Program report describing the improvements demonstrated by E.S. after receiving medication.

112.    Finding of Fact 23 of the ALJ's Decision demonstrates a misunderstanding and misstating of the evidence in the record regarding E.S.'s performance in the NIMH study and his ability to interact with peers.

113.    Finding of Fact 24 of the ALJ's Decision omits relevant factual evidence from the record, with the ALJ omitting strategies and paraphrasing others from the list provided by his NIMH teachers.

114.    In Finding of Fact 24, the ALJ incorrectly cites information as being from the list of strategies by E.S.'s teachers at NIMH, rather than the appropriate source, Dr. Kenneth Towbin.

115.    Finding of Fact 27 of the ALJ's Decision is inconsistent with the record, with nowhere in the record indicating that the August 2012 screening meeting was prompted due to concerns about E.S.'s aggressive behaviors.

116.    Finding of Fact 33 of the ALJ's Decision is inconsistent with the record and the results of the educational evaluation given to E.S. by MCPS.

117.    Finding of Fact 52 of the ALJ's Decision is inconsistent with the record, as the ALJ overlooks elements of the behavioral incidents described in this finding of fact and misstates the behavioral incidents as described in the record.

118.    Finding of Fact 53 of the ALJ's Decision is inconsistent with the record and it is unclear where the ALJ obtained the information for this finding of fact.

119.    Finding of Fact 54 of the ALJ's Decision is inconsistent with the record, as the parents were never interviewed as part of the FBA creation process.

120.    Finding of Fact 57 of the ALJ's Decision is inconsistent with the record and overlooks relevant evidence, providing an inaccurate portrayal of E.S.'s behavioral performance in the fall of 2015.

121.    Finding of Fact 58 of the ALJ's Decision is inconsistent with the record, providing an inaccurate summary of the language in the IEP document describing E.S.'s present level of performance in the area of written language.

122.    Finding of Fact 59 of the ALJ's Decision is inconsistent with the record, providing an inaccurate summary of the language in the IEP document describing E.S.'s present level of performance in the area of math.

123.    Finding of Fact 75 of the ALJ's Decision is inconsistent with the record, and, in instances, directly contradictory, with the ALJ overlooking key details of various behavioral incidents such as erroneously attributing the stabbing with a sharpened pencil to E.S., while the record reflects than another student actually stabbed him.

124.    Finding of Fact 76 of the ALJ's Decision is inconsistent with the evidentiary record, as the record contains many instances contrary to the ALJ's assertion that suggesting that E.S. do anything other than what he wanted to do resulted in threats, profanity or storming away, which the ALJ fails to reconcile in his decision.

125.    Finding of Fact 77 of the ALJ's Decision reflects a misunderstanding of the evidence before him at hearing, as the "comfy corner" was never set up in a general education classroom, but is part of the special education classroom at Ridgeview and was not set up solely as a resource for E.S.

126.    Finding of Fact 78 of the ALJ's Decision is inconsistent with the record, with the record being clear that E.S. was not always closely observed by an adult during gym class activities and the ALJ overlooking evidence of E.S.'s behavioral performance during gym class.

127.    Finding of Fact 83 of the ALJ's Decision is inconsistent with the record, which contains instances of school staff looking for E.S. rather than supervising him at all times.

128.    Finding of Fact 84 of the ALJ's Decision is inconsistent with the record, misrepresenting the situation surrounding the setting up of the meeting at Ridgeview and inaccurately describing Ms. Giustiniani as E.S.'s case manager, despite evidence that Ms. Potter was the case manager and an acknowledgement of the ALJ of Ms. Potter's role of case manager elsewhere in his decision.

129.    Finding of Fact 85 of the ALJ's Decision erroneously describes the time period where a prescribed medication had an adverse effect on E.S.'s behaviors as October 2015 through January 2016, contrary to clear testimony from his mother that the period E.S.'s behavior was impacted by the medication was from December 2015 through the beginning of January 2016.

130.    Finding of Fact 86 of the ALJ's Decision is directly contrary to the evidence in the record, with there being significant evidence of a change in E.S.'s behavior from January to March 2016.

131.    Finding of Fact 101 of the ALJ's Decision is contradicted by numerous instances in the record of E.S.'s positive behaviors, which the ALJ fails to reconcile with his finding.

132.    Finding of Fact 103 of the ALJ's Decision is directly contradictory to earlier findings in his decision where he ignored record evidence of the improvement in E.S.'s behavior.

-19-

133.    Finding of Fact 130 of the ALJ's Decision inaccurately portrays the June 14, 2016 incident, directly contradicting the testimony of Ms. Potter, who states that there was only one other student involved in the altercation, not two.

134.    In Finding of Fact 130 of the ALJ's Decision, the ALJ fails to reconcile the conflict between what was reported to the parents contemporaneously about the June 14, 2016 incident with what MCPS described at the due process hearing.

135.    Finding of Fact 134 of the ALJ's Decision incorrectly states that a meeting occurred to update E.S.'s FBA and BIP on June 21, 2016, despite evidence that no meeting occurred in June 2016 and that the parents were not aware that MCPS had updated the FBA or BIP until a July 2016 IEP meeting.

136.    Finding of Fact 136 of the ALJ's Decision incorrectly states that the July 18, 2016 IEP meeting participant list does not include Ms. Schwartz, despite a lengthy exchange at hearing when the parties discussed with the ALJ that the attendance list continued onto the Addendum to the IEP and pointed out where he could find her name listed.

137.    Finding of Fact 169 of the ALJ's Decision is inconsistent with the ALJ's conclusion later in his decision that Ms. Schwartz did not have any data or studies regarding the effectiveness of the Bridge program.

138.    The ALJ applied incorrect legal standards in reaching his Decision.

139.    The parents are aggrieved by the ALJ's Decision.

140.    The plaintiffs have exhausted their administrative remedies.


**COUNT I**

141.    Plaintiffs incorporate as though restated each of the factual allegations stated in paragraphs 1 through 140.

142.    Defendants' failure to provide E.S. with a free appropriate public education violates plaintiffs' rights under the IDEA and Maryland law.

## COUNT II

143.    Plaintiffs incorporate as though restated each of the factual allegations stated in paragraphs 1 through 140.

144.    Defendants' failure to provide E.S. with an appropriate educational placement violates plaintiffs' rights under the IDEA and Maryland law.

## COUNT III

145.    Plaintiffs incorporate as though restated each of the factual allegations stated in paragraphs 1 through 140.

146.    The ALJ committed error, and violated plaintiffs' due process rights under the IDEA and Maryland law, by failing to engage in regular fact finding or render a proper decision based on an accurate and impartial understanding of the facts and law.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs respectfully request that this Court:

1.    Issue judgment for plaintiffs and against defendants;

2.    Issue declaratory relief that defendants violated plaintiffs' rights under applicable law;

3.    Issue injunctive relief, vacating the decision of the ALJ and ordering defendants to reimburse plaintiffs for the costs associated with enrolling E.S. at the Ivymount School for the 2016-17 school year;

4.      Order defendants to place and fund E.S. at the Ivymount School for the 2017-18 school year and declare it to be his current educational placement under the IDEA;

5.      Order defendants to pay plaintiffs' reasonable attorneys' fees and costs, including the fees and costs of this action; and

6.      Award any other relief that this Court deems just.


                        Respectfully Submitted,


                        _____/s/_____
                        Michael J. Eig          #07718
                        Paula A. Rosenstock     #09798
                        MICHAEL J. EIG AND ASSOCIATES, P.C.
                        5454 Wisconsin Avenue
                        Suite 760
                        Chevy Chase, Maryland 20815
                        (301) 657-1740

                        Counsel for Plaintiffs