**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
*Southern Division*

| | | |
|---|---|---|
| **E.S.,** *et al.,* | * | |
| **PLAINTIFFS,** | * | |
| **v.** | * | **Case No.: PWG-17-3031** |
| **JACK R. SMITH,** *et al.,* | * | |
| **DEFENDANTS.** | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

### MEMORANDUM OPINION AND ORDER

E.S. ("Student"), a minor, by and through his Parents, B.S. and M.S. ("Parents"), who also joined their son as Plaintiffs, filed suit against Jack R. Smith in his official capacity as Superintendent of Montgomery County Public Schools ("MCPS") and Montgomery County Board of Education ("the Board"). Compl., ECF No. 1. Plaintiffs claim that Defendants failed to provide the Student, who has "Multiple Disabilities, including an Autism Spectrum Disorder ('ASD'), Attention Deficit Hyperactivity Disorder ('ADHD'), and an Anxiety Disorder," with "the Free Appropriate Public Education ('FAPE') to which he is entitled under the Individuals with Disabilities Education Improvement Act ('IDEA'), 20 U.S.C. §§1400 *et seq.*" *Id.* ¶¶ 1, 7. They ask the Court to reverse the decision of the administrative law judge ("ALJ") who reviewed the Student's individualized education program ("IEP") and MCPS's decision to place him in the Bridge Program at Gaithersburg Middle School and concluded that the IEP and placement provided an appropriate education for E.S. in the least restrictive environment, as required by the IDEA. *Id.* ¶¶ 1, 57–61.

According to Plaintiffs, the IEP fell short because it did not include "a full-time therapeutic placement," and the Bridge Program was not appropriate for the services the IEP required, which included "twenty-nine hours and twenty minutes of specialized instruction outside the general education setting, with the option to 'self-select' lunch in the general education setting." *Id.* ¶¶ 57–61. In a 90-page opinion, the ALJ "agree[d] with MCPS that the IEP and placement developed by the school system is appropriate and reasonably calculated to meet the individual needs of the Student," ALJ Dec. 86, and denied the parents the relief they requested, namely "funding and placement from MCPS for E.S. at the [private] Ivymount School ('Ivymount')," Compl. ¶ 1.

Plaintiffs argue that the ALJ erred in both his factual findings and legal analysis, including "failing to properly assess the credibility of witnesses and completely ignoring evidence of how E.S. has responded to his private placement at Ivymount." Pls.' Mem. 2.[1] They also contend that MCPS's "predetermination of E.S.'s placement . . . was explicitly admitted under oath by one MCPS witness and at a later IEP meeting by MCPS staff in front of the parents and their educational consultant," yet "the ALJ literally disregarded" the evidence. *Id.* But, giving due weight to the ALJ's factual findings and from my own *de novo* review of the entire record, I find that, E.S.'s IEP and placement were appropriate and reasonably calculated to meet his needs. Consequently, even if, *arguendo*, E.S.'s placement in the Bridge Program was predetermined, any error was harmless. Accordingly, I conclude that Plaintiffs are not entitled to judgment as a matter of law and Defendants are. Therefore, I will deny Plaintiffs' Motion for

---

[1] The parties have fully briefed cross-motions for summary judgment. ECF Nos. 17, 18, 18-1, 21, 22; *see also* ECF Nos. 23, 24 (filings regarding supplemental authority). A hearing is not necessary. *See* Loc. R. 105.6.

Summary Judgment, grant Defendants' Cross-Motion for Summary Judgment, and close this case.

## Free Appropriate Public Education

Children with disabilities are entitled to a free appropriate public education, or "FAPE," pursuant to the IDEA. 20 U.S.C. § 1412(a)(1)(A). Maryland regulations also "govern[] the provision of FAPEs to children with disabilities in accordance with the IDEA." *M.C. v. Starr*, No. DKC-13-3617, 2014 WL 7404576, at *1 (D. Md. Dec. 29, 2014) (citing Md. Code Regs. Tit. 13A, § 05.01). A FAPE is an education that provides "meaningful access to the educational process" in "the least restrictive environment" and is "reasonably calculated to confer 'some educational benefit'" on the child with a disability. *Id.* (citing *Bd. of Educ. of the Henrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 192, 207 (1982)). "The benefit conferred . . . must amount to more than trivial progress," but "[t]he IDEA does not require that a school district provide a disabled child with the best possible education . . . ." *Id.* (citing *Rowley*, 458 U.S. at 192; *Reusch v. Fountain*, 872 F. Supp. 1421, 1425 (D. Md. 1994)). Rather, a school must provide an Individualized Education Program ("IEP") that is "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 999 (2017) (noting that "[a]ny review of an IEP must appreciate that the question is whether the IEP is *reasonable*, not whether the court regards it as ideal").

To this end, each child with a disability must have an IEP that "state[s] the student's current educational status, annual goals for the student's education, which special educational services and other aids will be provided to the child to meet those goals, and the extent to which the child will be 'mainstreamed,' i.e., spend time in regular school classroom with non-disabled

students." *M.C.*, 2014 WL 7404576, at *1 (citing 20 U.S.C. § 1414(d)(1)(A)); *see Endrew F.*, 137 S. Ct. at 994.

> The IEP is "the centerpiece of the statute's education delivery system for disabled children." *Honig v. Doe,* 484 U.S. 305, 311 (1988). A comprehensive plan prepared by a child's "IEP Team" (which includes teachers, school officials, and the child's parents), an IEP must be drafted in compliance with a detailed set of procedures. [20 U.S.C.] § 1414(d)(1)(B) (internal quotation marks omitted). These procedures emphasize collaboration among parents and educators and require careful consideration of the child's individual circumstances. § 1414. The IEP is the means by which special education and related services are "tailored to the unique needs" of a particular child. *Rowley,* 458 U.S., at 181.

*Endrew F.*, 137 S. Ct. at 994. If the IEP team members disagree about the contents of an IEP, they can try to "resolve their differences informally, through a '[p]reliminary meeting,' or, somewhat more formally, through mediation," and if they do not reach agreement, they can participate in "a 'due process hearing' before a state or local educational agency." *Id.* (quoting 20 U.S.C. §§ 1415(e), (f)(1)(A), (B)(i), (g)). Then, "the losing party may seek redress in state or federal court." *Id.* (citing 20 U.S.C. § 1415(i)(2)(A)).

In Maryland, parents may voice disagreement with their children's proposed IEPs and request due process hearings before the Maryland Office of Administrative Hearings to address their concerns. *See M.C.*, 2014 WL 7404576, at *2 (citing 20 U.S.C. § 1415(b)(6), (f); Md. Code Ann., Educ. § 8–413; Md. Code Regs. Tit. 13A, § 05.01.15(C)(1)). "Any party can then appeal the administrative ruling in federal or state court." *Id.* (citing Educ. § 8–413(h)). Additionally, parents may place their children in a private school that is "appropriate to meet the child's needs" and "seek tuition reimbursement from the state," but only "if the court or hearing officer finds that the agency had not made a free appropriate public education available to the child in a timely manner prior to that enrollment." *Id.* (quoting Title 20 § 1412(a)(1)(C)(iii); citing *Sch.*

*Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359, 369–70 (1985)) (emphasis from *M.C.* removed).

## **Background**[2]

Much of the background to this case is undisputed, and the parties provided it to the Court in a Joint Stipulation of Undisputed Facts.[3] ECF No. 16. The Student initially was diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD") and Oppositional Defiant Disorder ("ODD") in November 2011, while he was in second grade, and a Section 504 Plan that "provided a variety of accommodations in the classroom" was implemented. *Id*. at 1. A few months later, he "was diagnosed with Generalized Anxiety Disorder ("GAD"), ADHD (combined type), ODD, and Severe Mood Dysregulation." *Id*. at 1–2. Dr. Kenneth E. Towbin found that the Student "also [met] the criteria for a diagnosis of Social Learning Disorder" and "stated that he could 'stretch to say' that E.S. ha[d]s a mild Pervasive Developmental Disorder – Not Otherwise Specified, a diagnosis most consider to be part of the larger group of Autism Spectrum Disorder (ASD), but opined that Social Learning Disorder was a more accurate diagnosis." *Id*. at 2. He "recommended that the primary focus of his IEP should be for his anxiety, Social Learning Disorder, and pragmatic language impairments." *Id.*

Following "concerns about E.S.'s aggressive behavior, completion of written tasks, social skills, difficulty managing transitions, and anxiety," the Student was evaluated in September 2012 by the psychologist at his elementary school, who concluded that his "symptoms were

---

[2] In reviewing a motion for summary judgment, the Court considers the facts in the light most favorable to the nonmovant, drawing all justifiable inferences in that party's favor. *Ricci v. DeStefano*, 557 U.S. 557, 585–86 (2009); *George & Co., LLC v. Imagination Entm't Ltd.*, 575 F.3d 383, 391–92 (4th Cir. 2009). Where, as here, the Court is presented with cross-motions for summary judgment, the facts relevant to each motion must be considered in the light most favorable to the nonmovant. *Mellen v. Bunting*, 327 F.3d 355, 363 (4th Cir. 2003).

[3] The parties separately identify additional facts that they deem material, which I address in the Discussion section of this Memorandum Opinion and Order.

consistent with GAD, ADHD, and mood dysregulation" and that he "met the criteria for an emotional condition that exhibits the following characteristics: '(1) inappropriate types of behavior or feelings under normal circumstances and (2) a tendency to develop physical symptoms or fears associate[d] with personal or school problems.'" Jt. Stip. Facts 2. The resource teacher at the school also evaluated him; E.S. had "scores of very advanced in letter-word identification, passage comprehension, reading vocabulary, applied problems, quantitative concepts, brief reading, reading comprehension, and math reasoning, and average to high average scores in all other areas assessed." *Id.* at 2–3. Educational consultant Rich Weinfeld, whom the Parents hired, also evaluated E.S. in Fall 2012 and "provided written input to the IEP team." *Id.* at 3.

The IEP team at his elementary school met and placed him in the Social and Emotional Support Services Program ("ED Program") at Great Seneca Creek Elementary School during third grade, and he stayed in that program through the end of fifth grade. *Id.* There, "he received special education services under the primary disability of Other Health Impairment ['OHI']." *Id.* In September 2014, a school psychologist evaluated him and concluded that his "reasoning abilities on verbal tasks are generally in the Very Superior range, while his nonverbal reasoning abilities are significantly lower and in the High Average range," and that he "had symptoms of ADHD and mood disorder," as well as "mild ASD and learning difficulties." *Id.* A December 2014 report that a behavior support teacher prepared "reflected that E.S. performed from Average to Superior in all academic areas," but needed classroom supports to "complete assignments" and "strengthen problem-solving." *Id.* at 3–4.

E.S.'s May 28, 2015 IEP "reflected a primary disability of Multiple Disabilities, consisting of a Specific Learning Disability and ASD," had "goals in behavior, organization,

math, and oral and written expression, and "called for four general education co-taught classes per day (math, science, social studies, and physical education), and three self-contained classes per day (English, resource, and social skills)." Jt Stip. Facts 4. E.S.'s "appropriate placement in the least restrictive environment for E.S. was the Asperger's Program at Ridgeview Middle School ('Ridgeview')." *Id.*

E.S. attended sixth grade at Ridgeview for the 2015-2016 school year. Decision at 19. E.S. had frequent behavioral episodes during his first three months at Ridgeview. Decision at 20. On November 5, 2015 the Parents and Ridgeview staff met to discuss the components of an updated Functional Behavior Assessment ("FBA") and Behavioral Intervention Plan ("BIP"), as well as revise the IEP. MCPS-4, 5 [MCPS Hr'g Ex. 4, at 5]. The behaviors addressed by the FBA/BIP included unsafe behavior, such as aggression to peers/staff and crafting objects into what seems to be a weapon in order to "intimidate," and verbal threats/inappropriate language. MCPS-4. The team also made revisions to the IEP. MCPS-5.

An annual review meeting was held on March 3, 2016. P-20. The March 3, 2016 IEP included goals in behavior (including a general behavior goal, plus one in safety and social emotional problem-solving), social skills (including peer interaction and group participation), task completion, written language and organization. *Id.* The IEP team, after reviewing the available data, including data which showed that E.S. was not making sufficient progress on his goals, recommended that the appropriate placement in the least restrictive environment for E.S. was the Bridge Program ("Bridge") at Gaithersburg Middle School. *Id.* After hearing the concerns of the parents regarding E.S. transferring schools in the middle of the school year, the team agreed to allow E.S. to remain at Ridgeview for the remainder of the school year, and then transfer to Bridge at the start of the 2016-2017 school year. *Id.* The parents also requested to visit the Bridge program "in order to be better informed about the proposed placement." *Id.* The IEP called for continuing services "as is" at Ridgeview for the remainder of the 2015-2016 school year, and, beginning the 2016-2017 school year, called for self-contained English, math, social studies, PE/Health, social skills, resource; a supported science class; and access to counseling. *Id.*

Mr. Weinfeld observed E.S. in his classroom at Ridgeview on April 13, 2016, in E.S.'s math and World Studies classes. P-25. Mr. Weinfeld wrote a report of his observation. *Id.* In math, Mr. Weinfeld observed that E.S. had a paraeducator working with him and seemed to respond well. *Id.* In World Studies class, the teacher reported that E.S. always does well in his class. *Id.* In his report, Mr. Weinfeld opined that E.S. needed a program designed for students with "Asperger's" who are capable of challenging academic work while providing supports for dealing with frustration. *Id.*

On June 2, 2016, Dr. Lance Clawson wrote a Psychiatric Second Opinion for E.S. P-31. Dr. Clawson opined that E.S. "requires a school placement that has the intensive social training and extensive behavioral expertise to address his ASD related 'mind blindness' juxtaposed onto his intense vigilance regarding how others may be thinking about him." *Id.* Dr. Clawson mentioned Ivymount as "one such local institution." *Id.*

On June 15, 2016, E.S. was suspended for four days following a behavioral incident involving physical aggression toward another student, and failure to listen to or follow adult directions. P-33.

An IEP periodic review meeting was next held at Ridgeview on July 18, 2016. P-37. The team proposed classroom instruction outside of general education for 7 periods per day [that is, 29 hours and 20 minutes per week of special education in self-contained classrooms], including a 30 minute lunch, although E.S. could "self-select" general education lunch "if he chooses." *Id.* The IEP also called for weekly counseling sessions [that is, four 45-minute sessions per month]. *Id.* The team again determined that the appropriate placement in the least restrictive environment for E.S. was the Bridge Program at Gaithersburg Middle School. *Id.* The parents and Mr. Weinfeld shared that they did not believe that Bridge was an appropriate placement for E.S. and requested referral to the Central IEP Team for placement in a program with a more therapeutic component. *Id.*

*Id.* at 4–6.  Notably, the Parents did not object to any aspect of the IEP other than E.S.'s placement. *See* Prior Written Notice from July 18, 2016 IEP Mtg., P-37, at 68 (Parents' Exs. 432) ("Document any parental requests that were considered, but were not agreed to in this IEP: Parents disagree with the placement in Bridge services and want a referral to CIEP[4] for a program with a more therapeutic component.").

The Parents applied for E.S to attend Ivymount, and he was accepted there in August 2016.  Jt. Stip. Facts 6.

On August 10, 2016, the parents served notice of their intent to place E.S. at Ivymount for the 2016-17 school year and requested that MCPS fund his placement there. P-40. On August 25, 2016, MCPS responded, declining to place E.S. at Ivymount and stating that a FAPE had been offered for the 2016-17 school

---

[4] "CIEP" stands for "Central Individualized Education Program"; the CIEP Team "is used if school-based options have been ruled out and the school IEP team is considering a separate public or private special education day school." Problem Solving for Student Success 76, Montgomery Cty. Pub. Schs., www.montgomeryschoolsmd.org (search for "CIEP" on home page).

year. *Id.* E.S. began the Model Asperger's Program ("MAP"), at Ivymount in August 2016. Decision at 6.

. . .

On February 21, 2017, the parents filed a due process hearing request challenging the appropriateness of the school system's proposal for E.S. to attend Bridge, and seeking reimbursement for his placement at Ivymount. P-1. On March 7, 2017, the parents filed an unopposed motion to amend their due process hearing request to include a more accurate, "description of the proposed solution." *Id.* The parents' motion was granted on March 10, 2017. Decision at 1. A due process hearing was held on May 22, 24, 25, 30, 31, and June 17, 2017. Decision at 2.

Jt. Stip. Facts 6, 8.

The ALJ issued a Decision on July 12, 2017, making the following findings of fact regarding the July 18, 2016 IEP:

158.    The July 18, 2016 IEP team considered the requirement that E. be placed in the least restrictive environment, and whether the least restrictive environment met E.'s individual needs. It considered the services and supports at E.'s home school, (John Poole Middle School), the services and supports at the Ridgeview Asperger's Program, and the services and supports available for E. at the Bridge Program. The IEP teams also considered the challenges E. continued to face in succeeding in a general education population, and his progress toward IEP goals and objectives in a self-contained environment.

*All Self-Contained Classes*

159.    The July 18, 2016 IEP provided for E. to attend a self-contained setting for all seven daily periods of classroom instruction, with a special education classroom teacher as his primary provider. The July 18, 2016 IEP provided that E. would participate with non-disabled peers during transition, during locker room with adult support, and that E. had the option of participating with non-disabled peers during lunch.

*Addition of Related Services*

160.    In addition to transportation to and from school with adult support, which was also in the March 3, 2016 IEP, the July 18, 2016 IEP provided that E. would receive forty-five minutes a week of counseling, with the school social worker as primary provider.

161.    The July 18, 2016 IEP provided that placement would be at the Bridge Program.

162.     The July 18, 2016 IEP was in conjunction with the revised BIP of June 21, 2016, which provided for the addition of a team of staff to support E. during critical incidents, and access to staff with expertise in supporting social-emotional problem solving.

163.     At the July 18, 2016 IEP meeting, the Parents did not object to the goals, objectives, supports and accommodations, or supplementary aids in the IEP. The Parents voiced that they did not consider the Bridge Program a good fit for E.

**The Bridge Program**

164.     The focus of the Bridge Program (program) is to work with students to make changes in behavior to act more appropriately in the classroom.

165.     Program students have a wide range of needs. Some students are OHI, some are emotionally disabled (ED), and some are autistic. Most have an inability to understand social cues and need support navigating social situations. All students at a particular grade level are educated together. Autistic students are not segregated from the others. No non-disabled students attend the program.

166.     Some program students are aggressive and make threats. The program uses Crisis Prevention Institute (CPI) methods to address difficult situations and to de-escalate them, and staff are trained to use these methods.

167.     The program has sensory support rooms. There is a quiet room with beanbag chairs and large stuffed animals. Students can remove themselves to the quiet room, and teachers may remove a student to the room to deal with students who are irritable, anxious, or depressed. There is also room with support equipment, treadmills and exercise balls, for students with the need to work through problems differently by movement or physical release.

168.     The program (at the time of the hearing) has twenty-four or twenty-five students attending three grades. A third of those students are Asperger's students. Many face challenges

like E., and are ritualistic and rigid. Most program students need predictability of routine, have difficulty with group participation, and an emotional response to stress.

169. The program is designed to immediately address a student's problem, with the goal of working through the problem and returning to class as soon as possible. The program has been successful at extinguishing destructive behaviors.

170. The program uses a behavior contract, with points earned for accomplishing goals, some from the IEP, and others not. Points can be earned for class engagement or for completing work. A points total is maintained daily so a student is aware on a day-by-day basis how many points have been earned. Students have the opportunity to use points toward awards on Friday. Students, not teachers, decide from among choices what award is the goal for the week.

171. The program has embedded supports. All classes have a special education teacher and one para-educator, and some classes have a teacher and two para-educators.

172. The program goal is to identify what a specific student needs and to understand the student's overload points. Students use flash passes when they need a break. Students also have access to the program office, the program psychologist, and the program social worker.

173. The program only has self-contained classes, including physical education if an IEP calls for self-contained physical education. Para-educators always attend physical education class, and there is adult support in the locker room. Program students can elect to change for gym class in the Health room, if they prefer.

174. The program is on the first floor of Gaithersburg Middle School, down a separate corridor, in a quieter area. Hallway transitions are supervised with adult escorts during transition if necessary. Non-disabled general education population students do not transition through program hallways. Program students who attend general education classes transition to and from

the general education hallways. Program class transition times are scheduled to be staggered with general population class transition times to minimize the extent to which program students are in the same hallways at the same times as general education students.

175. The program has three classes, each organized by grade. The current population (as of the date of the hearing) is nine sixth graders, eight full-time and one part-time seventh grader, and seven eighth-graders. Students attend class only with others in the same grade.

176. The program has two Asperger's students in the sixth grade. Had E. attended the program there would have been three. In the current sixth grade class, none are below grade level in math, some are at grade level, and some are above grade level. All sixth graders in the program are attending social skills class.

177. Class size varies slightly, as some students attend part of the day in a general education setting. Two sixth-graders attend general education classes 50% of the day. All but one seventh-grader and all eighth-graders attend at least some general education classes.

178. Students attend discreet subject matter classes. Students attend Science with a teacher and a para-educator and, when the bell rings, transition to math, with a different teacher and different para-educator.

179. Almost every student who attends the program arrives with an IEP that calls for 100% self-contained classes. The goal is to increase participation in general education classes and work toward graduation with a diploma. The program addresses the academic need of advanced students and has students who are performing academically at and above grade level.

180. The program has mental health professional supports in the form of a psychologist and a social worker. The psychologist is present two days a week, for full days. The social worker is present four days a week, for half days. Both have responsibilities at other MCPS schools. Mr. Homon, who was E.'s social worker at Great Seneca Creek, is the program social

worker. He also has responsibilities at Northwest High School Bridge Program. The psychologist also has responsibilities at Hoover Middle School. Gaithersburg High School is five minutes away, with a psychologist available to fill in at the program if necessary to resolve a crisis.

181.    The counseling aspect of the program includes group counseling, and individual counseling. Counseling is done by both the psychologist and the social worker, and typically a student is provided counseling services by both of them. Group counseling is typically scheduled once a week. The program also includes social skills classes. These classes are not taught by a mental health professional.

182.    Sensitivity to loud noise, and sensitivity to crowds and chaos are common with students in the program. Some program students also have sensitivity or aversion to some aromas, or tactile sensitivities and do not like the feel of certain surfaces or fabrics. The program offers an election to students to eat lunch with the general education population or to eat lunch in a separate closed room behind the cafeteria, or eat lunch in the teachers' lounge. All locations have para-educator support. Students in the program attend school assemblies with general education non-disabled students, supported by para-educators. Program students can opt out of assemblies if they prefer not to attend.

183.    Program students are transported to and from school on a special needs bus. The bus has adult supervision other than the driver. Students on the bus are met by staff who escort program students to their program home room. Students can walk to program classes without an escort, if they elect to do so.

184.    The program addresses the needs of students based on the needs presented, not the student's disability or special education disability code. Each student is educated according to his or her specific needs.

185.    Gaithersburg Middle School has some IEP students who are not in the program.

186.    The program is not subject to peer review.

187.    Ms. Schwartz is present at the program all day, five days a week.  She meets with teachers and mental health staff members several times weekly, and at times participates in direct intervention with a student.  If she and staff see a behavior change or problem, they address it immediately and do not wait until a student's BIP is updated to incorporate a change.  The program is designed to eliminate the need for a FBA or BIP.

ALJ Dec. 50–55.[5]

> The ALJ concluded that the July 18, 2016 IEP met the IDEA requirements that it
>
> include "a statement of the child's present levels of academic achievement and functional performance," describe "how the child's disability affects the child's involvement and progress in the general education curriculum,'" and set out "measurable annual goals, including academic and functional goals," along with a "description of how the child's progress toward meeting" those goals will be gauged.

*Id.* at 82 (quoting 20 U.S.C. § 1414(d)(1)(A)(i)(I)–(III)).   He also concluded that the IEP "describe[d] the 'special education and related services . . . that will be provided' so that the child may 'advance properly toward attaining the annual goals' and, when possible, 'be involved in and make progress in the general education curriculum.'"   *Id.* (quoting 20 U.S.C. § 1414(d)(1)(A)(i)(IV)).   Additionally, he concluded that "[t]he classroom curriculum, the accommodations, aids and supports, in conjunction with the related services in the IEP, are designed specifically to address E's challenges with academic areas and to address behavior, peer interaction, social situations and to decrease unwanted and unsafe behaviors."  *Id.* at 83–84.

---

[5] "FBA" is an abbreviation for Functional Behavior Assessment, and "BIP" is an abbreviation for Behavioral Intervention Plan.  Jt. Stip. Facts 4.

He noted that "the issue was not whether the goals and objectives were appropriate – the issue was 'where they could be met,' – i.e., placement." *Id.* at 84.

Noting that the IEP "is not required to be perfect," he concluded that placement was appropriate, reasoning that Robin Daisey, April Schwarz, and Katherine Schwartz "sufficiently explained" the July 18, 2016 IEP and its components, and their choices are entitled to deference. *Id.* As for goals and objectives for academic improvement, the ALJ concluded that "the IEP provides "a detailed set of goals and objectives" for areas of performance where E.S.'s "disabilities affect achievement," as well as "a comprehensive set of supports, aids and program modifications to reach these goals." *Id.* at 85. In sum, he concluded that "E. was not denied a FAPE by the July 18, 2016 IEP" because

> the Bridge Program will use a concert of professionals, with Ms. Schwartz at the baton, to address E.'s educational and behavioral needs. Special educators and para-educators will address the academic areas. E.'s day-to-day, moment-to-moment needs will be addressed by staff trained in crisis intervention techniques who know how to de-escalate a situation instead of making it worse. E will be counseled weekly, at a minimum, by a trained social worker and a school psychologist. Ms. Schwartz will receive constant updates as to E.'s progress and participate in intervention.

*Id*. at 85–86. Dissatisfied, Plaintiffs filed suit in this Court, Compl., and the parties filed the pending summary judgment motions.

## Standard of Review

In reviewing cross-motions for summary judgment in an IDEA action, the "'reviewing court is obliged to conduct a modified *de novo* review'" of the administrative record, "'giving "due weight" to the underlying administrative proceedings.'" *M.C. v. Starr*, No. DKC-13-3617, 2014 WL 7404576, at *6 (D. Md. Dec. 29, 2014) (quoting *M.M. ex rel. D.M. v. Sch. Dist. of Greenville Cty.*, 303 F.3d 523, 530–31 (4th Cir. 2002) (citing *Bd. of Educ. of the Henrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176 (1982)). This means that when an ALJ makes

findings of fact "in a regular manner and with evidentiary support," those findings "are entitled to be considered *prima facie* correct," and "the district court, if it is not going to follow them, is required to explain why it does not." *Doyle v. Arlington Cnty. Sch. Bd.*, 953 F.2d 100, 105 (4th Cir. 1991); *see N.P. v. Maxwell*, 711 F. App'x 713, 718 (4th Cir. 2017); *M.C.*, 2014 WL 7404576, at *6–7. The Court then reaches its decision based on the preponderance of the evidence. *Rowley*, 458 U.S. at 205. Yet, the Court cannot "substitute [its] own notions of sound educational policy for those of local school authorities." *M.C.*, 2014 WL 7404576, at *6–7 (quoting *M.M.*, 303 F.3d at 530–31 (quoting *Hartmann v. Loudoun Cty. Bd. of Educ.*, 118 F.3d 996, 999 (4th Cir. 1997))). The burden of proof is on Plaintiffs as the party seeking relief. *See Barnett v. Fairfax Co. Sch. Bd.*, 927 F.2d 146, 152 (4th Cir. 1991), *cert. denied*, 502 U.S. 859 (1991).

"This standard works in tandem with the general standard of review for summary judgment, which also applies in IDEA cases . . . ." *M.C.*, 2014 WL 7404576, at *7. Thus, summary judgment is proper when the moving party demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c)(1)(A); *see Baldwin v. City of Greensboro*, 714 F.3d 828, 833 (4th Cir. 2013). If the party seeking summary judgment demonstrates that there is no evidence to support the nonmoving party's case, the burden shifts to the nonmoving party to identify evidence that shows that a genuine dispute exists as to material facts. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 & n.10 (1986). When considering cross-motions for summary judgment, "the court must view each motion in a light most

favorable to the non-movant." *Linzer v. Sebelius*, No. AW-07-597, 2009 WL 2778269, at *4 (D. Md. Aug. 28, 2009); *see Mellen v. Bunting*, 327 F.3d 355, 363 (4th Cir. 2003).

## Discussion

*Credibility of Witnesses and their Testimony*

Plaintiffs contend that the ALJ "improperly credited the school system's witnesses over the parents', ignoring key credibility issues and failing to properly weigh testimony," and as a result, "the ALJ blindly accepted what MCPS witnesses said," even though it was the parents' witnesses who had "firsthand knowledge of E.S. and his educational needs." Pls.' Mem. 17. In Plaintiffs' view, this means that the ALJ's findings of fact, which rely on MCPS witness testimony over the Parents' witnesses' testimony, are not owed any deference, and the resulting Decision "should be overturned." *Id.* at 24.

The issue is whether the ALJ's credibility determinations are "regularly made," because if they are, then they, as well as the educators' opinions, are due deference. *M.C. v. Starr*, No. DKC-13-3617, 2014 WL 7404576, at *11 (D. Md. Dec. 29, 2014) (noting that, in *S.A. v. Weast*, 898 F. Supp. 2d 869, 874 (D. Md. 2012), this Court stated that it "owes deference to the ALJ's determinations of the credibility of witnesses[,] and . . . owes generous deference to educators" when it reviews IDEA cases). An ALJ's findings are "regularly made" when "they are reached through a process that is [within] the accepted norm of a fact-finding process." *J.P. ex rel. Peterson v. Cty. Sch. Bd. of Hanover Cty., Va.*, 516 F.3d 254, 259 (4th Cir. 2008). Thus, the findings are regularly made if the ALJ "conducted a proper hearing, allowing the parents and the School Board to present evidence and make arguments, and the hearing officer by all indications resolved the factual questions in the normal way, without flipping a coin, throwing a dart, or otherwise abdicating his responsibility to decide the case." *Id.* Indeed, the Fourth Circuit has

held that a reviewing court cannot "reverse a trier of fact, who had the advantage of hearing the testimony, on the question of credibility." *Doyle v. Arlington Cty. Sch. Bd.,* 953 F.2d 100, 104 (4th Cir. 1991) (quoting *McCrary v. Runyon*, 515 F.2d 1082, 1086 (4th Cir. 1975), *aff'd*, 427 U.S. 160 (1976); concluding that the reason given by the reviewing officer for the State Board of Education "for discrediting a witness who[m] he had not seen or heard testify, in the face of the crediting of that same witness by a hearing officer who had seen and heard the witness testify, [wa]s so far from the accepted norm of a fact-finding process designed to discover truth that . . . the due weight which should be accorded the decision of the reviewing fact-finding officer depending on that credibility decision [wa]s none"). Moreover, while the district court must "'explain its reasons for rejecting the findings of the hearing officer,'" the "IDEA hearing officer is not required to offer a detailed explanation of his or her credibility assessments." *S.A.*, 898 F. Supp. 2d at 877 (quoting *Cty. Sch. Bd. of Henrico Cty., Va. v. Z.P.*, 399 F.3d 298, 306 (4th Cir. 2005)).

At the administrative hearing in this case, the Parents themselves testified on their own behalf, along with Jennifer Catherine Engel, the Program Coordinator for the Model Asperger's Program at Ivymount, and Rich Weinfeld, an educational consultant. The ALJ noted that, while "Ms. Engel testified about Ivymount and its Model Asperger's Program[,] . . . [s]he did not criticize the MCPS IEP, nor was she called as a witness for that program." ALJ Dec. 4 n.5. Thus, Ms. Engel's testimony about what happened *after* the July 18, 2016 IEP meeting simply was not relevant to the one issue the ALJ reached – whether "the Student's 2016-2017 individualized education program (IEP) fail[ed] to provide a free appropriate public education." *Id.* at 3; *see Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 999 (2017) ("[C]rafting an appropriate program of education requires a *prospective* judgment by

school officials." (emphasis added)); *Schaffer ex rel. Schaffer v. Weast*, 554 F.3d 470, 477 (4th Cir. 2009) ("Judicial review of IEPs under the IDEA is meant to be largely prospective and to focus on a child's needs looking forward; courts thus ask whether, at the time an IEP was created, it was 'reasonably calculated to enable the child to receive educational benefits.' *Rowley,* 458 U.S. at 207. But this prospective review would be undercut if significant weight were always given to evidence that arose only after an IEP were created. Judicial review would simply not be fair to school districts, whose decisions would be judged in hindsight . . . ." (some citations omitted).

The ALJ found that the Student's mother, Mrs. S., "was a strong and credible witness," ALJ Dec. 61. He noted that she testified that E.S. was "bright, inquisitive, articulate, and sweet when he is happy, but he displays aggressive behaviors when he is frustrated, including kicking, biting, and throwing tantrums." *Id.* at 62. The ALJ neither discounted this testimony nor reached a contrary conclusion. Mrs. S. stated that she cared more about "finding what works" for E.S.'s needs than about whether the label of the program fit E.S.'s diagnosis. May 25, 2017 Tr. 101; *see also* May 25, 2017 Tr. 18 (Mrs. S.'s testimony that "the ED program . . . fit [E.S.'s] needs"). She also testified that E.S. did "as well as he was capable of doing" at Great Seneca Creek, May 25, 2017 Tr. 19, where he was in a program for students with emotional disabilities, even though he had never "been coded emotionally disabled." May 24, 2017 Tr. 198–200. Indeed, such testimony supports the conclusion that the Bridge Program could be an appropriate placement for E.S., as its design is to address the needs of "[s]tudents with social and emotional needs," including "students who have the code of ED and . . . students who have the code of autism, the code of other health impaired . . . ." May 31, 2017 Tr. 108 (Katherine Schwartz's testimony); May 24, 2017 Tr. 238, 240 (Mrs. S.'s testimony). Thus, the only testimony from

Mrs. S. that the ALJ did not believe over conflicting testimony is Mrs. S.'s testimony that "Ms. Schwartz at the Bridge Program . . . said the Bridge Program was not equipped to handle explosive students."  ALJ Dec. 62; *see* May 24, 2017 Tr. 237.  Given the extent of the testimony to the contrary from Ms. Schwartz herself—explaining that all staff at the Bridge Program are trained to manage and diffuse explosive behavior—it was reasonable for the ALJ to credit that testimony from Ms. Schwartz, an educator at the Bridge Program, over the mother's recollection of Ms. Schwartz's statement.  *See* May 31, 2017 Tr. 109 (Ms. Schwartz's testimony that the Bridge Program "deal[s] . . . a lot" with students "with depression, irritability, aggravated behaviors" and does "have students that are aggressive and can make threats in [the] program" and, to handle these students and meet their needs, the Bridge Program "utilize[s] CPI, which is the restraint training that [Montgomery] county uses if [they] need to escort and/or hold students for the safety of themselves or others," and it also has "a room that is . . . call[ed] a student support center and that room can be utilized by students when they're needing a place that's quiet and a place to be").

The ALJ found the Student's father's "testimony to be credible," but noted that the father (who testified that "to make progress [E.S.] needs [therapy] to be . . . part of day-to-day life . . . part of the entire program," June 17, 2017 Tr. 32) was "not, however, a psychologist or special educator with the training and experience to opine what level of psychological support E. needs to succeed in school, but academically and functionally."  ALJ Dec. 68.  The ALJ gave deference to MCPS's determination of E.S.'s counseling needs instead of relying on the father's testimony to determine the amount of counseling E.S. needed and April Schwarz's and Katherine Schwartz's testimony to determine the availability of psychological support in the Bridge Program.

Indeed, the school district's "notions of sound educational policy" are entitled to considerable deference. *See M.M.*, 303 F.3d at 530–31; *Hartmann*, 118 F.3d at 999; *M.C.*, 2014 WL 7404576, at *6–7; *S.A.*, 898 F. Supp. 2d at 874. "[I]t is a longstanding policy in IDEA cases to 'afford great deference to the judgment of education professionals.'" *N.P. v. Maxwell*, 711 F. App'x 713, 717 (4th Cir. 2017) (quoting *E.L. ex rel. Lorsson v. Chapel Hill-Carrboro Bd. of Educ.*, 773 F.3d 509, 517 (4th Cir. 2014)). Nonetheless, "[a] reviewing court may fairly expect those authorities to be able to offer a cogent and responsive explanation for their decisions that shows the IEP is reasonably calculated to enable the child to make progress appropriate in light of his circumstances." *Endrew F.*, 137 S. Ct. at 1002.

The ALJ's decision with regard to which witnesses' testimony to assign the most weight shows that the ALJ "resolved the factual question[]" of what psychological support E.S. needed and whether the Bridge Program was appropriate to provide it "in the normal way": by considering the qualifications of the person testifying to E.S.'s psychological needs and the Bridge Program's services. Likewise, while the father testified that E.S. would "tend[] to select the general population lunch. But then the level of stimulation and the noise in the cafeteria proves problematic," June 17, 2017 Tr. 36, Mallory Potter, who was E.S.'s primary teacher for the year as well as his case manager, testified that E.S. rarely had conflicts in the lunchroom (only two or three over the course of the year, "[i]f that"), and did not require special education support, typically eating quickly and then going to the media center for the remainder of the period, May 25, 2017 Tr. 203–04. It was not a coin flip for the ALJ to believe the educator, who was present with E.S. at Ridgeview, over the father, who was not.

The ALJ gave Mr. Weinfeld's testimony "limited weight," providing sound reasoning for doing so that is supported by the record. ALJ Dec. 67. The ALJ found that Mr. Weinfeld had

considerable experience as a teacher, including teaching students with emotional disorders, but was not a psychologist. *Id*. at 63–64. This is a reason to give little weight to his assessment of the Bridge Program's ability to meet E.S.'s mental health needs, as is the fact that Mr. Weinfeld had not worked for the school system in more than a decade and therefore was not well informed about "its use of psychologists." *Id*. at 67.

The ALJ found that Mr. Weinfeld's opinion that the Bridge Program was not appropriate for E.S. was not credible and "was, in large part, based on achieving the Parents' goal of convincing [the ALJ] that the Bridge Program would not provide FAPE." ALJ Dec. 67. He reasoned that Mr. Weinfeld did not provide an adequate explanation for his change in opinion from when he observed the Student at Ridgeview, visited the Bridge Program, spoke to Ms. Schwartz, and concluded that "while the Bridge Program might not be ideal, it may be able to meet E.'s needs." *Id*. at 64; *see* May 22, 2017 Tr. 69 (Mr. Weinfeld's testimony that "Bridge [was] still in the running in [his] opinion, as far as being a possible placement"). The ALJ noted that Mr. Weinfeld testified that "his opinion regarding the capacity for the Bridge Program to meet E.'s needs changed when he . . . saw data from Ridgeview relating to the number of classroom instruction hours E. missed at Ridgeview from April through June 2016," but the ALJ did not find that this evidence of Ridgeview's inappropriateness supported Mr. Weinfeld's conclusion that the Bridge Program also was not appropriate. ALJ Dec. 65; *see* May 22, 2017 Tr. 69–71 (Mr. Weinfeld's testimony that his opinion changed because he "knew from talking to the parents that E[.]'s behavior had really deteriorated during the end of the school year" and "at that point, [he] felt like [E.S.] needed a more restrictive environment, and specifically an environment that was targeted to high-functioning autistic students who simultaneously had significant behavioral challenges").

Certainly, Mr. Weinfeld did explain that he initially did not think E.S. was aggressive, and changed his mind about Bridge being appropriate based on E.S.'s behavior in Spring 2016 and his conclusion that E.S. actually was aggressive. May 22, 2017 Tr. 88. Yet, there is credible testimony from Ms. Schwartz that the Bridge Program serves aggressive students, negating Mr. Weinfeld's basis for finding the program inappropriate. May 31, 2017 Tr. 108–09. Additionally, I note that there was evidence that, from April through June, the Ridgview staff had reduced the amount they intervened, which suggests that the increase in E.S.'s interruptive behavior and classroom hours missed could be attributed, at least in part, to the staff's approach to intervention rather than a change in E.S.'s needs. *See* May 24, 2017 Tr. 251 (Mrs. S.'s testimony that the Ridgeview staff were not implementing E.S.'s behavior intervention program in April, May or June 2016 and had told her that "they weren't going to push him because they didn't want to take a chance of him exploding, so they were just kind of letting him be"); May 25, 2017 Tr. 182 (Ms. Potter's testimony that Ridgeview agreed to "maintain [E.S.] throughout the rest of the year and keep him safe," while she "ha[d] concerns that he won't make progress on his behavioral goals. And Social Skills and perhaps Safety"); *see also* ALJ Dec. 70 ("After the March 3, 2016 IEP meeting, and the decision that E. would remain at Ridgeview through the end of the school year, staff scaled back on the interventions and efforts to enforce and implement various behavior elements of the BIP and IEP. This resulted in E. having more discretion and more missed classroom time."). Further, Mr. Weinfeld's insistence that Ivymount was a better fit, when Ridgeview (which was "crafted using methods advocated by the Academic Director at Ivymount") was, without dispute, not a good fit, calls into question his credibility. *See* ALJ Dec. 67.

Additionally, the ALJ noted that Mr. Weinfeld was concerned about "[p]ermitting E. to self-select general education lunch because E. was known to elope and the general education lunch provided too little adult supervision"; he also was concerned that "[t]ransitioning with the general education population, unattended, may also present problems." ALJ Dec. 65; *see* May 22, 2017 Tr. 84, 92 (Mr. Weinfeld's testimony that "the regular hallways, the lockers, the lunchroom, the PE locker room, all of those environments were very difficult for him to deal with"). Also, Mr. Weinfeld stated that "[i]t [wa]s possible that, at times, others in E.'s peer group would be out of class for electives leaving E. as a class of one student." ALJ Dec. 65; *see* May 22, 2017 Tr. 90 (Mr. Weinfeld's testimony). But, Mr. Weinfeld conceded that he actually did not know whether support staff would be with E.S. if he chose to eat lunch in the general population. May 22, 2017 Tr. 162–63. And, he conceded that the Bridge Program has "its own little area of classrooms." *Id.* at 186. Moreover, evidence regarding the Bridge Program environment and supports from Katherine Schwartz, *see* May 31, 2017 Tr. 113–29, who explained how the Bridge Program could provide for E.S.'s needs and whose familiarity with the Bridge Program as a resource teacher there greatly exceeds Mr. Weinfeld's limited knowledge, certainly merits more weight. Mr. Weinfeld also opined that the July 18, 2016 IEP set "too low a target" for E.S.'s "behavior-safety" goals, and his "problem solving success and social skills success targets were too low." ALJ Dec. 65. Again, decisions made by MCPS and, specifically, educators who had worked with E.S. and explained why the Bridge Program could provide a FAPE for him, as opposed to Mr. Weinfeld who only observed him briefly, *see* May 22, 2017 Tr. 147 (Mr. Weinfeld's testimony that he never evaluated E.S. or even interviewed him within the past year); May 25, 2017 Tr. 45 (Mrs. S.'s testimony that Mr. Weinfeld spent about an hour with E.S. in 2012), should outweigh this evidence from Mr. Weinfeld. *See Endrew F.*, 137 S. Ct. at

1002; *N.P.*, 711 F. App'x at 717; *E.L.*, 773 F.3d at 517; *M.M.*, 303 F.3d at 530–31; *Hartmann*, 118 F.3d at 999; *M.C.*, 2014 WL 7404576, at *6–7. Thus, in deciding to assign Mr. Weinfeld's testimony limited weight, the ALJ's analysis follows a normal fact-finding process; he has not "abdicat[ed] his responsibility to decide the case." *See J.P.*, 516 F.3d at 259.

MCPS offered four witnesses, all of whom the ALJ found credible: Mallory Potter, a special education teacher who was E.S.'s primary teacher and case manager while he was at Ridgeview; Robin Daisey, MCPS's Autism Program Specialist; April Schwarz, MCPS's School Psychologist for Autism and Asperger's Programs; and Katherine Schwartz, Resource Teacher at the Bridge Program. ALJ Dec. 70, 73, 75, 76. Like Mr. S., Ms. Potter testified about E.S.'s psychological needs and the Bridge Program's ability to meet those needs, and the ALJ gave her opinion in that regard "limited weight" because she was "not a psychologist, and has never observed the Bridge Program." ALJ Dec. 71; *see* May 30, 2017 Tr. 70 (Ms. Potter's testimony that she "had very general information on the Bridge program just from doing student teaching at MCPS"). Thus, he did not "blindly accepted what MCPS witnesses said," as Plaintiffs insist, *see* Pls.' Mem. 17. As with the similar testimony from Mr. S., this finding was "regularly made" and entitled to deference. Given Ms. Potter's time in the classroom with E.S. and other students, the ALJ accepted her testimony that "E.'s behavioral and social issues are not the same as those presented by other [students with] Asperger's [whom] she teaches, and that E. requires staff more skilled in addressing these issues than is available at Ridgeview." ALJ Dec. 71. This finding, also, is regularly made and entitled to deference.

Consistent with Ms. Potter's testimony, Ms. Daisey testified that E.S.'s advanced verbal skills, accompanied by "significant problems with social interaction, written language, executive functioning, and problem solving" were "consistent with most Asperger's students," but his

"physically aggressive behavior," "[e]xplosive behavior" and "threats of violence" were not. ALJ Dec. 71–72. The ALJ observed:

> Ms. Daisey testified that the Bridge Program is capable of implementing a 100% self-contained schedule, and that E. does better in a self-contained setting than in the general education setting. . . . The Bridge Program has mental health counseling, with a social worker as the primary provider . . . . The Bridge Program also has specially-trained staff to attend to E.'s needs in the moment. The Bridge Program has access to the general education curriculum, with accelerated instruction for areas in which E. excels. The July 18, 2016 IEP, Ms. Daisey testified, is designed for E. to make meaningful progress and is reasonably calculated to meet his academic and functional instructional needs, and the Bridge Program can implement the IEP.

*Id.* at 72–73; *see* May 30, 2017 Tr. 138–41 (noting "the capacity [of the Bridge Program] to provide a self-contained setting – which clearly E[.] was doing better in self-contained classes; he was less overwhelmed in a small class and that was important – as well as the availability of mental health support through the counselor, through the school psychologist or the social worker at Bridge"). The ALJ gave significant weight to Ms. Daisey's testimony. He followed a normal process in evaluating her testimony, noting that she had considerable experience "in the instruction of students with autism"; she had observed E. and discussed his behavior at Ridgeview on numerous occasions, such that "[h]er insights and opinions directly addressed E., and were not generalizations"; and she was familiar with the Bridge Program. ALJ Dec. 72–73; *see* May 30, 2017 Tr. 152–53 (Ms. Daisey's testimony that she met "with classroom staff to review difficulties the students were having and problem-solving to come up with strategies and supports to better meet their needs" and that she visited Ridgeview weekly, observing E.S. "regularly in a variety of classes").

The ALJ also gave "significant weight" to April Schwarz's testimony, noting that she had "several years of experience with autistic students" and "personal knowledge of the components of the Bridge Program," as well as "familiar[ity] with many of the psychological assessments in

E.'s history." ALJ Dec. 74–75. He noted her testimony that "E. has a lot going on psychologically and that no single label or diagnosis explains all of his behaviors"; that "E. was successful at Great Seneca Creek's emotional disability ground in part because of the counseling he received from Mr. Homon, now a counselor at the Bridge Program"; and that "[c]ounseling should have been made part of the Ridgeview IEP as E. transitioned to middle school." *Id.* at 74. Indeed, Ms. Schwarz testified that the 2012 psychological evaluation of E.S. "talk[ed] about him having to a marked degree inappropriate types of behaviors, and tenancy [sic] to develop physical symptoms," which is "the criteria for an emotional disability." May 31, 2017 Tr. 32.

The ALJ found that Katherine Schwartz had "a significant depth of experience and insight" and, accordingly, gave "great weight to her testimony." ALJ Dep. 76. This reasoning is not arbitrary, and his findings are entitled to deference. Moreover, my *de novo* review of the record confirms the accuracy of his factual findings regarding Ms. Schwartzs testimony. The ALJ noted that Katherine Schwartz testified that "[t]he Bridge Program is capable of accommodating students who are aggressive and act out," and "[e]vents like the fight in the hallway at Ridgeview that resulted in E.'s four-day suspension occur at the Bridge Program, but not frequently." ALJ Dec. 75. He said that she testified that "[m]ost Bridge Program students have problems with emotional responses to stress, or are aggressive, or have wide mood swings, or engage in attention-seeking behaviors." *Id.* at 76. He added that she testified that "[t]he staff is . . . specially trained in crisis intervention methods designed to address a crisis situation and make it better, not worse," *id.*, and that "the Bridge Program can implement all aspects of the [July 18, 2016] IEP," *id.* at 75.

It is true that Ms. Schwartz testified that the Bridge Program is designed to address the needs of "[s]tudents with social and emotional needs," including "students who have the code of

ED and . . . students who have the code of autism, the code of other health impaired . . . ." May 31, 2017 Tr. 108. According to Ms. Schwartz, the Bridge Program does "have students that are aggressive and can make threats in [the] program." *Id.* at 109. She testified that "there's probably some form of aggression on a daily basis," and "multiple students . . . have had multiple aggressive episodes." *Id.* at 173.

To handle these students and meet their needs, the Bridge Program "utilize[s] CPI, which is the restraint training that [Montgomery] county uses if [they] need to escort and/or hold students for the safety of themselves or others," and it also has "a room that is . . . call[ed] a student support center and that room can be utilized by students when they're needing a place that's quiet and a place to be." *Id.* at 109. All teachers are "CPI trained." *Id.* at 180. She testified that the program "deal[s] . . . a lot" with students "with depression, irritability, aggravated behaviors." *Id.* at 109. She stated that "a third of [the] students" have "high functioning autism or Asperger's." *Id.* at 111.

Ms. Schwartz testified that the Bridge Program's "goal is to be able to deal with problems immediately because that is how [the] students learn best." *Id.* at 112. To that end, when "[a] problem arises, [t]he goal is to work through it at that moment, if they need to come out of the class to work through it, and then get back to class." *Id.* at 112. She stated that all classes have at least one paraeducator in addition to the teacher, and the paraeducators "have the ability to take the student out of the classroom" as needed to "take a break," which could involve going to the psychologist or social worker's office or a "sensory room" that was "built with these students [with autism] in mind." *Id.* at 113–15.

With regard to the hallway where the Bridge Program classes are located, Ms. Schwartz testified that, other than a computer lab, "there are no other general education classes in [that]

hallway." *Id.* at 118.  As a result, "it is quieter.  There aren't as many students in [the] hallway," and [t]here is staff that is supervising" and sometimes walking students from class to class. *Id.* at 119.  Students can also choose to "transition prior to the bell or after the bell so they were the only kid in the hallway." *Id.* at 129.

She also testified that the program has a part-time physical education teacher who teaches a "class exclusively for bridge kids," and all of the paraeducators go to physical education with the students.  *Id.* at 120, 122, 123. The paraeducators and teacher go into the locker rooms as well, and students can choose to change in the health room instead or not to change at all. *Id.* at 124–25.  Additionally, a paraeducator goes to lunch with the students, and "there is also a room at the back of the cafeteria . . . and currently [t]he eight grade [Bridge] students eat back there because it's quieter and they prefer a quieter place." *Id.* at 126–27.

As for counseling, Ms. Schwartz testified that the school psychologist is present two days a week and "[a]lmost all students in bridge receive group counseling. It's part of the program and some receive individual," which is provided regularly, "[i]f needed"; three currently receive individual counseling from either the psychologist or the social worker. May 31, 2017 Tr. 188. The IEP requires a social worker to be the primary provider of weekly counseling, and Ms. Schwartz testified that the social worker is present "at least four half days a week or more." *Id.* at 190.  She stated that if neither the social worker or the psychologist is present but a student needs mental health services, the staff "would call them and get them there"; if the two who typically work at the Bridge Program are not available, "there is always backup." *Id.* at 190.

Ms. Schwartz testified that the Bridge Program could implement all aspects of E.S.'s IEP. *Id.* at 155–57.  She said that E.S. "would have reasonably been expected to make meaningful progress in light of his individual circumstances which include both his high cognitive ability as

well as his behavioral needs through the implementation of his July 18, 2016 IEP at the bridge program for the 2016-2017 school year" because "his profile is typical to others that [the Bridge Program has] been serving and they are making meaningful gains." *Id.* at 160.

*Weight Due to Findings of Fact*

I also must determine the weight to give the ALJ's findings of fact. *See Doyle v. Arlington Cty. Sch. Bd.*, 953 F.2d 100, 105 (4th Cir. 1991). According to Plaintiffs, the ALJ's findings of fact were not "regularly made" and are not "entitled to deference," because he "consistently omitted relevant evidence from the record in his findings of fact in an apparent attempt to fit the narrative of his Decision and to ignore conflicts with the school system's position." Pls.' Mem. 7. Plaintiffs identify "faulty findings of fact" regarding E.S.'s scores on an educational evaluation that MCPS administered; his written language skills; his scores on a psychological evaluation; his behavior during an NIH evaluation; the details of certain behavioral incidents; his teacher's "concern . . . at the start of the 2015-16 school year that the program was not appropriate for E.S." (which Plaintiffs insist is unsupported by the record); E.S.'s "behavioral performance in the fall of 2015"; his violent and/or threatening behavior; the time period in which a medication impacted E.S.'s behavior; and the changes in E.S.'s behavior between January and March 2016. Pls.' Mem. 7–11. Yet, Plaintiffs concede that "there was general agreement at the July 2016 IEP meeting about how E.S. was functioning so [Weinfeld] and the parents agreed with the majority of the goals and accommodations on the IEP." Pls.' Mem. 21. Nonetheless, Plaintiffs insist that "E.S.'s behavioral functioning was critical for the ALJ to understand when making his Decision." Pls.' Reply & Opp'n 7.

Notably, Plaintiffs repeatedly insist that E.S.'s scores, performance, and behavior were better than the ALJ portrayed them to be. Pls.' Mem. 7–11. Thus, given that one of Plaintiffs'

primary arguments is that the Bridge program could not provide a FAPE because E.S. needed fully self-contained instruction—that is, no time at all in the general population—along with a therapeutic component, the alleged factual inaccuracies in the ALJ Decision would support, rather than disprove their position.

Moreover, it appears that Plaintiffs' contentions that the ALJ ignored evidence and, consequently, reached conclusions contrary to the evidence, stem—with regard to the material facts—from the ALJ's decision to give "limited weight" to Plaintiffs' witnesses' testimony, especially Weinfeld's, and not to give "any weight" to Dr. Lance Clawson's written June 2, 2016 psychiatric opinion, in which he opined that the Bridge program lacked the social instruction and behavioral management that E.S. needs. P-31.  As discussed, I agree with the ALJ's weight and credibility determinations regarding the witnesses' testimony.  As for Dr. Clawson's written opinion, the ALJ "consider[ed] his views to be much less than well-informed on the subject of the appropriateness of the Bridge Program," and did not give Dr. Clawson's opinions "any weight," reasoning that "Dr. Clawson did not testify" and "is not an educator, and did not observe E. at Ridgeview or any other school" and "did not visit the Bridge Program or meet with Ms. Schwartz to discuss with her the components of the program."  ALJ Dec. 77–78.  The ALJ also noted that Dr. Clawson's "May 10, 2017 letter was provided five days prior to the document exchange by the parties, suggesting it was prepared specifically for the purpose of this litigation."  *Id.* at 77–78.  I agree with the ALJ's decision not to give Dr. Clawson's opinions any weight. *See Bd. of Educ. of Frederick Cty. v. I.S. ex rel. Summers*, 325 F. Supp. 2d 565, 589 (D. Md. 2004) ("Hearsay alone may constitute 'substantial evidence' supportive of a finding [by an ALJ], but the finding of the ALJ should not rest solely on the hearsay testimony that does not have rational probative force." (citing *Leitman v. McAusland,* 934 F.2d 46, 51 (4th Cir. 1991))).

Thus, the ALJ's findings of fact were regularly made and entitled to deference. *See J.P.*, 516 F.3d at 259. And, insofar as Plaintiffs argue that the overall minor inaccuracies cumulatively provide a basis for concluding that the ALJ's findings of fact were not regularly made, I disagree, and in any event, I have reviewed the record *de novo*.

*FAPE*

To obtain court-ordered reimbursement for the Student's private education, Plaintiffs first must demonstrate that "the public school system failed to provide a free appropriate public education." *Carter ex rel. Carter v. Florence Cty. Sch. Dist. Four*, 950 F.2d 156, 161 (4th Cir. 1991) (stating that, if plaintiffs establish the first element, the second element to prove is that "the private school chosen by the parents did provide an appropriate education to the child"). In this regard, Plaintiffs make two primary arguments: (1) E.S. needed, but the IEP did not call for, a therapeutic component to his education and (2) E.S. needed (and the IEP required), but the Bridge program could not provide, a fully self-contained setting, with no time spent in the general student population.

Plaintiffs cite Dr. Clawson's written June 2, 2016 opinion that the Bridge Program "doesn't have the direct social instruction and behavioral management necessary for [E.S.'s] management," Pls.' Mem. 4 (quoting P-31). And, they cite Mr. Weinfeld's testimony that "he "felt like [E.S.] needed a more restrictive environment, and specifically an environment that was targeted to high-functioning autistic students who simultaneously had significant behavioral challenges," as well as his testimony that "Bridge could not implement E.S.'s IEP because of the thirty hours per week of self-contained services and the need for therapy-integrated services." Pls.' Mem. 22 (quoting May 22, 2017 Tr. 71, 87–88); *see* Pls.' Reply & Opp'n 16–17 (same). According to Plaintiffs, "Bridge is not set up to be a fully self-contained program. In order to

implement E.S.'s IEP, it would have to improvise, including providing self-contained instruction to him that no one else in the program was receiving." Pls.' Reply & Opp'n 17. As Plaintiffs see it, "the record is clear that [E.S.] struggled in the general education setting, including in the hallways and during classes like physical education," and E.S. "would have been faced with these same potential difficulties at Bridge, as the program is housed in a comprehensive middle school and he would have been exposed to the general education setting during transitions in the hallway, in the lunchroom, and in the locker room and physical education class." Pls.' Mem. 28 (citing May 22, 2017 Tr. 95 (Mr. Weinfeld's testimony); May 25, 2017 Tr. 66 (Mrs. S.'s testimony)).

But, as noted, the ALJ properly assigned Mr. Weinfeld's testimony little weight and Dr. Clawson's written opinion no weight. There was no other evidence that E.S. needed a therapeutic component to his education, beyond the weekly counsel required by his IEP. Thus, the ALJ properly deferred to MCPS's determination that four hours of counseling services per month, as stated in the IEP and as would have been provided through placement in the Bridge Program, was appropriate for E.S. *See N.P.*, 711 F. App'x at 717; *E.L.*, 773 F.3d at 517; *M.M.*, 303 F.3d at 530–31; *Hartmann*, 118 F.3d at 999; *M.C.*, 2014 WL 7404576, at *6–7.

Moreover, Ms. Potter, E.S.'s teacher and case manager for his year at Ridgeview, testified that he was "[f]ine in the hallways," and that hallways were "never something that [she] remember[ed] being a huge issue." May 30, 2017 Tr. 78. Similarly, Ms. Daisey testified that, with the exception of an incident when E.S. "was already in the hallway doing some work of his own, unattended, apparently, and then the other classes let out," E.S. made "multiple transitions [from class to class in the hallway] per day, . . . without difficulty." May 30, 2017 Tr. 177–78. And, Ms. Schwartz's testimony, discussed above, negated the concerns about the hallways

(which are separate from and quieter than those used by the general population, and which have paraeducators present), the lunchroom (which also has paraeducators present, has a quiet section, and which students can choose to leave or never enter), physical education (which is fully self-contained, with paraeducators present, and the locker room (which has paraeducators and the physical education teacher present and which students can choose not to use). May 31, 2017 Tr. 113–29. She also testified that the classes have six to nine students in them, May 31, 2017 Tr. 121–22, and ten students, two of whom are in E.S.'s grade, are fully self-contained, *id.* at 184, such that E.S. would not be left alone while all other students participated in a general education class. Thus, giving the ALJ's decision its due deference and having conducted a *de novo* review of the record, I find that E.S.'s placement in the Bridge Program was appropriate.

Simply put, a FAPE, to which a child with a disability is entitled, is the education that any student without disabilities would receive. *See D.L. ex rel. K.L. v. Balt. Bd. of Sch. Comm'rs*, 706 F.3d 256, 260–61 (4th Cir. 2013) ("Public schools are only required to make a FAPE available on equal terms to all eligible children within their district."). The IEP is "individualized" or "personalized" to ensure that a child can access that education, considering his or her individual or personal cognitive and developmental capabilities and needs. It must be appropriate, but it need not be the best possible education. *See Endrew F.*, 137 S. Ct. at 999; *Bd. of Educ. of the Henrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 192, 207 (1982); *M.C. v. Starr*, No. DKC-13-3617, 2014 WL 7404576, at *1 (D. Md. Dec. 29, 2014). Indeed, the IDEA only requires that the IEP be "reasonably calculated to enable a child to make progress in light of the child's circumstances." *Endrew F.*, 137 S. Ct. at 999. Plaintiffs have not shown that, as a result of the goals set in the IEP, the absence of a therapeutic component, or the placement in the Bridge Program, the Student would not have benefitted educationally from following the IEP or

that he would not have access to a FAPE. "[T]he insistence of parents that a non-public school setting is more appropriate does not establish the inappropriateness of the public school, even if the child would have benefitted more in the private setting." *Id.* As the ALJ explained in his well-reasoned decision, the IEP and the Student's proposed placement in public school were reasonably calculated to provide him with a FAPE for the 2016-17 school year.

*Predetermination*

Plaintiffs insist that, even if the IEP's contents and the Student's placement were appropriate, they are entitled to summary judgment on procedural grounds. One procedural requirement to ensuring that a student receives a FAPE is that "a school board may not predetermine what school a student may be placed in before creating the student's Individualized Education Plain and engaging in a discussion over what schools are suitable under the student's IEP." *M.C.E. ex rel. T.Q.A. v. Bd. of Educ. of Frederick Cty.*, No. RDB-09-3365, 2011 WL 2709196, at *8 (D. Md. July 11, 2011) (citing *Spielberg v. Henrico County Pub. Schs.,* 853 F.2d 256, 259 (4th Cir. 1988). Thus, "a school board must come to the IEP table with an open mind," as doing otherwise would deny the parents "the opportunity for any meaningful input." *Id.* at *9 (quoting *Hanson v. Smith,* 212 F. Supp. 2d 474, 485–86 (D. Md. 2002)). This is not, however, a requirement that the school board "come with a blank mind." *Id. (*citing *Hanson*, 212 F. Supp. 2d at 485–86; noting that "[o]ther circuits have similarly held that a school board may come to an IEP team meeting with some idea of what placement may be best for a student because "[p]redetermination is not synonymous with preparation" (quoting *Nack v. Orange City Sch. Dist.,* 454 F.3d 604, 610 (6th Cir. 2006))).

Procedural violations may amount to an IDEA violation if they "significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a

free appropriate public education to the parents' child." 20 U.S.C. § 1415(f)(3)(E)(ii)(II). Plaintiffs insist that "[t]he decision to place [a student at a new school] before developing an IEP on which to base that placement violates [34 C.F.R. § 300.552]," which required placement based on the child's IEP, and the placement "also violates the spirit and intent of the [IDEA], which emphasizes parental involvement." Pls.' Mem. 13 (quoting *Spielberg v. Henrico Cty. Public Schools*, 853 F.2d 256, 259 (4th Cir. 1988). It is true that, in *Spielberg*, the Fourth Circuit "highlighted that, '[a]fter the fact involvement is not enough." *Id*. at 13–14 (quoting *Spielberg*, 853 F.2d at 259). Additionally, the Fourth Circuit concluded that, on the facts before it, in which the student was to be moved from a private school to a public school, the school system violated the Education of All Handicapped Children Act ("EHA," the predecessor of IDEA), by "resolv[ing] to educate [the student] at [the public school], and then develop[ing] an IEP to carry out the[] decision." *Spielberg*, 853 F.2d at 259. Under those circumstances, the court held that "[t]his failure to follow EHA procedures is sufficient to hold that the defendants failed to provide [the student] with a FAPE." *Id.* The court noted, however, that "in some instances, the placement decision can precede IEP development," such as when the child will be placed in a private school, given that "34 C.F.R. § 300.347 calls for the private school which a child will attend to participate in IEP development." *Id.*

Moreover, *Spielberg* dates back thirty years, and more recently, the Fourth Circuit and this Court have held that "a violation of a procedural requirement of the IDEA (or one of its implementing regulations) must actually interfere with the provision of a FAPE before the child and/or his parents would be entitled to reimbursement relief [for private educational assistance]." *DiBuo ex rel. DiBuo v. Bd. of Educ. of Worcester Cty.*, 309 F.3d 184, 190–91 (4th Cir. 2002); *see also M.C.E. ex rel. T.Q.A. v. Bd. of Educ. of Frederick Cty.*, No. RDB-09-3365, 2011 WL

2709196, at *8 (D. Md. July 11, 2011) (observing that, "[u]nder the Individuals with Disabilities Education Act, a procedural violation is only actionable if it interferes with a provision of the student's free appropriate public education," because otherwise "'these violations are not sufficient to support a finding that an agency failed to provide a free appropriate public education'" (quoting *DiBuo*, 309 F.3d at 190)). This is true "even when the procedural violation 'interfere[s] with the parents' ability to participate in the development of their child's IEP.'" *M.C.E.*, 2011 WL 2709196, at *8 (quoting *DiBuo,* 309 F.3d at 190–91); *see also R.F. v. Cecil Cty. Pub. Sch.*, No. ADC-17-2203, 2018 WL 3079700, at *8 (D. Md. June 21, 2018) (same). Therefore, "ordinarily, procedural violations of the IDEA are subject to a harmlessness analysis." *M.C.E.*, 2011 WL 2709196, at *8; *see also A.K. v. Alexandria City Sch. Bd.,* 484 F.3d 672, 679 n.7 (4th Cir. 2007) (noting that a procedural violation is "subject to harmlessness analysis [unlike] a substantive violation").

In *R.F.*, the student and her parents filed suit against Cecil County Public Schools ("CCPS") following an administrative hearing, arguing that CCPS "committed procedural violations of the IDEA by, *inter alia*, "making changes to the IEP and R.'s placement without holding an IEP meeting." 2018 WL 3079700, at *9. This Court "agree[d] with Defendant" that "to the extent that there was such a violation, any procedural violation was harmless." *Id.* It reasoned:

> Plaintiffs, who carry the burden of proof, have failed to demonstrate that Defendant's failure to convene an IEP meeting with Plaintiffs denied R. a FAPE. As discussed above[,] "[p]arents and guardians play a significant role in the IEP process." *Schaffer*, 546 U.S. at 53. However. "[i]f a disabled child received (or was offered) a FAPE in spite of a technical violation of the IDEA, the school district has fulfilled its statutory obligations." *Snyder ex rel. Snyder v. Montgomery Cty. Pub. Sch.*, No. DKC 2008-1757, 2009 WL 3246579, at *8 (D. Md. Sept. 29, 2009) (quoting [*M.M. ex rel. D.M. v. Sch. Dist. of Greenville Cty.*, 303 F.3d 523, 534 (4th Cir. 2002)). Because Defendant's failure to hold an IEP meeting had no impact on whether the 2016—2017 IEP assured R. of a FAPE,[]

the Court agrees with the ALJ that the procedural violations at issue are insufficient to support a finding that Defendant failed to provide R. a FAPE. *See Bd. of Educ. of Frederick Cty. v. I.S. ex rel. Summers*, 325 F.Supp.2d 565, 580 (D. Md. 2004); *see also DiBuo*, 309 F.3d at 191 (rejecting the plaintiffs' "propose[d] broad legal rule to the effect that a procedural violation of the IDEA (or one of its implementing regulations) that causes interference with the parents[`'`] ability to participate in the IDEA process *per se* constitutes a denial of a FAPE to the disabled child at issue").

*R.F.*, 2018 WL 3079700, at *12 (noting, in a footnote, that the Court also concluded that "the ALJ properly found that the ICSC was an appropriate placement as part of R.'s IEP and offered R. a FAPE").

Here, to the extent that Plaintiffs argue that MCPS predetermined a "*proposed* placement," Pls.' Mem. 12, or a "placement *recommendation*," Pls.' Reply & Opp'n 4, 5, it is not an IDEA violation to come to an IEP meeting with suggestions. *M.C.E.*, 2011 WL 2709196, at *9; *Hanson*, 212 F. Supp. 2d at 485–86; *see also Nack*, 454 F.3d at 610. There certainly is evidence in the record, however, that MCPS did not simply propose or recommend a placement but actually predetermined E.S.'s placement in the Bridge Program before the March 3, 2016 IEP meeting and/or before the July 18, 2016 IEP meeting. *E.g.*, May 25, 2017 Tr. 176–77 (Ms. Potter's testimony that the March 3, 2016 IEP discussion focused on "when" E.S. would transfer to the Bridge Program); *id.* at 187 (Ms. Potter's testimony that placement was predetermined); June 17, 2017 Tr. 16 (Mr. S.'s testimony that MCPS informed him at the March 3, 2016 "we're going to move E[] to Bridge"); May 31, 2017 Tr. (Ms. Daisey's testimony that the IEP team discussed at the end of the March 3, 2016 meeting that E.S. "was placed at Bridge"); May 22, 2017 Tr. 64 (Mr. Weinfeld's testimony agreeing that "the decision had already been made at th[e] [March 3, 2016] IEP meeting to place him at Bridge"); May 30, 2017 Tr. 166–67, 169, 173 (Ms. Daisey's testimony that MCPS "had made the placement" at the March 3, 2016 IEP meeting and "[t]he question was whether he would move during 6th or at the start of 7th"); *see*

*also* May 30, 2017 Tr. 123 (Ms. Daisey's testimony that, at the March 3, 2016, the IEP team "agreed to have him remain at Ridgeview for the fourth quarter of 6th grade and transition to Bridge at the start of his 7th grade year").  Nonetheless, any predetermination was harmless because, as discussed above, MCPS provided E.S. with a FAPE.

In sum, Plaintiffs have not shown that "the public school system failed to provide a free appropriate public education." *See Carter*, 950 F.2d at 161.  Therefore, Plaintiffs are not entitled to judgment as a matter of law, whereas Defendants are.

## ORDER

Accordingly, it is, this 23rd day of July, 2018, hereby ORDERED that

1. Plaintiffs' Motion for Summary Judgment, ECF No. 17, IS DENIED;

2. Defendants' Motion for Summary Judgment, ECF No. 18, IS GRANTED; and

3. The Clerk IS DIRECTED to CLOSE THIS CASE.


_____/S/_____
Paul W. Grimm
United States District Judge

lyb

39